IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES ANTHONY MENDOLERA, | ) | CASE NO.  1:18-CV-02604-SL |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Charles Mendolera ("Plaintiff" or "Mendolera"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On September 1, 2015, Mendolera filed an application for POD, DIB, and SSI, alleging a disability onset date of August 28, 2015 and claiming he was disabled due to "spinal stenosis, pinch [sic] nerve, spinal cord, broken neck, cervical myelopathy, and muscle spams [sic]." (Transcript ("Tr.") 10, 324.) The

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

applications were denied initially and upon reconsideration, and Mendolera requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 10.)

On October 3, 2017, an ALJ held a hearing, during which Mendolera, represented by counsel, testified. (*Id.*) The ALJ "wanted updated evidence regarding [Mendolera's] vision problems and updated medical treatment records." (*Id.*) On March 6, 2018, the ALJ held a supplemental hearing, during which Mendolera and an impartial vocational expert ("VE") testified. (*Id.*) On April 11, 2018, the ALJ issued a written decision finding Mendolera was not disabled. (*Id.* at 10-21.) The ALJ's decision became final on September 7, 2018, when the Appeals Council declined further review. (*Id.* at 1-6.)

On November 12, 2018, Mendolera filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 16, 18.) Mendolera asserts the following assignments of error:

(1) The ALJ committed an error of law and the decision is not supported by substantial evidence as the ALJ failed to properly consider [Mendolera's] psychological conditions and resulting symptoms as severe impairments at Step Two of the sequential evaluation.

(2) The ALJ erred by not following the requirements of SSR 96-8p when making the RFC determination, and the RFC determination is not supported by substantial evidence.

(Doc. No. 13) (capitalization corrected).

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Mendolera was born in November 1974 and was 43 years-old at the time of his supplemental administrative hearing (Tr. 36, 111), making him a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a college education and is able to communicate in English.

(*Id.* at 323-25.)  He has past relevant work as a Mortgage Loan Originator, Inventory Clerk, General Hardware Sales, Telephone Sales Representative, and Advertising Sales Representative.  (*Id.* at 21.)

**B.    Medical Evidence[2]**

In June 2014, Mendolera fell and hit his head on an asphalt driveway while running away from a swarm of bees after accidentally running over their nest.  (Tr. 1142, 442.)  An MRI taken immediately after Mendolera's accident indicated "focal myelomalacia within the cord on the right and left side corresponding to areas of uncovertebral hypertrophy at C5-6 presumably from prior insult or injury."[3]  (*Id.* at 412-13.) The imaging also revealed "multilevel degenerative changes of the cervical spine superimposed on a background of congenital canal stenosis."  (*Id.* at 413.)  There was "no acute or worrisome process involving the cervical spine."  (*Id.*)

On July 24, 2014, Mendolera went to the ER complaining of bilateral neck and shoulder pain and an itchy feeling in a "bilateral sleeve-like distribution to just below elbows since accident."  (*Id.* at 452.) The treatment notes reflect that Mendolera's MRI showed "a moderate herniation at C3-C4 and lesser herniation and stenosis at C5, C6 and C7."  (*Id.* at 453.)  Mendolera told his provider that, with respect to C5, the issues related to a previous cervical fracture from years ago.  (*Id.*)  A physical examination revealed that Mendolera was in no apparent distress, had a normal gait, and had 5/5 strength in all muscle groups. (*Id.*)  Positive examination findings included pain to palpation in the spinous process and the paraspinals. (*Id.*)  The treatment plan consisted of a pain management consult with Dr. Leizman.  (*Id.*)  The treatment notes state that surgery for Mendolera's herniated disc at C3 may be considered if his symptoms worsenend or persisted.  (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] Myelomalacia is the "morbid softening of the spinal cord."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1210 (30th Ed. 2003).  Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in the size of its constituent cells."  *Id.* at 890.

On August 6, 2014, Mendolera saw Daniel Leizman, M.D., at the Cleveland Clinic's Pain Management Center complaining of continued neck pain since his initial injury in June.  (*Id.* at 517.) Mendolera described his pain as aching, burning, numbness, sharp, throbbing, and tingling.  (*Id.*)  He told Dr. Leizman he had weakness, numbness, tingling particularly in both arms, but also a little in his legs sometimes.  (*Id.*)  Mendolera stated the pain was aggravated by lifting and lying down.  (*Id.*)  Mendolera could not identify any positions or factors that mitigated his pain.  (*Id.*)

Dr. Leizman noted that the June 2014 MRI revealed straightening of the cervical lordosis with endplate changes and disc herniation located from C3-4 and disc bulging at C5-6 and C6-7.  (*Id.* at 518.) On examination, Dr. Leizman found Mendolera had "significant neck swelling" and "pain to palpation over the cervical paraspinous and trapezius muscles."  (*Id.* at 520.)  Mendolera's range of motion in his neck was moderately decreased and had pain with flexion, extension, and lateral flexion.  (*Id.*)  Mendolera had full, pain free range of motion in his peripheral joints.  (*Id.*)  Dr. Leizman prescribed a Medrol dose pack, Gabapentin, and physical therapy.  (*Id.* at 521.)

On August 19, 2014, Mendolera met with Inna Keselman, DPT, OCS, for an initial physical therapy evaluation.  (*Id.* at 511.)  Mendolera complained of pain over the central aspect of his neck, bilateral numbness and tingling in his shoulders and upper arms, and occasional bilateral foot numbness.  (*Id.*)  A physical examination revealed decreased cervical lordosis[4] and a cervical range of motion of 25% in all directions.  (*Id.*)

On September 2, 2014, Mendolera met with Dr. Teresa Ruch, who had seen him years ago for a cervical fracture, for a second opinion.  (*Id.* at 454.)  Mendolera complained of "terrible neck pain," "some pain in his left shoulder," and "numbness and tingling in his fingers and toes."  (*Id.*)  A physical examination

---

[4] Lordosis is defined as "1. the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side. 2. Abnormal increase in this curvature . . . ."  *Id.* at 1067.

4

revealed normal gait and motor strength, intact pinprick sensation, and symmetrical reflexes.  (*Id.* at 455.)
Dr. Ruch noted: "MRI scan shows he is 3 for huge disc herniation with spinal cord [] impingement.  He also
has 56 changes from his fracture that he had years ago with cord contusion.  I told him he could continue
his physical therapy but most likely he is going to need to have a 3 for disc done . . . It will need to be done
at some time in the future pain [sic] especially if he develops any permanent deficits."  (*Id.*)

On October 20, 2014, Mendolera saw Sharif Salama, M.D., for pain management.  (*Id.* at 400.)
Mendolera complained of severe pain in the back of his neck, pain between his shoulder blades, tingling in
his hands and feet bilaterally, and itching and tingling bilaterally from his shoulders to his elbows. (*Id.*)
While the pain reduced Mendolera's ability to lay in certain positions and turn his head far left or far right,
he had no sleep limitations.  (*Id.*)  Mendolera rated his pain as 5/10 but stated the tingling and itching had
improved since his last visit.  (*Id.*)  A physical examination revealed Mendolera was mildly distressed
because of his pain, he had moderate tenderness bilaterally at the lower cervical facet, and his cervical spine
range of motion was reduced and painful.  (*Id.* at 401-02.)  Dr. Salama's notes reflect diagnoses of
cervicalgia, cervical spine stenosis, displacement of cervical intervertebral discs without myelopathy,
bilateral arm pain, and radiculitis.  (*Id.* at 402.)  Dr. Salama prescribed Neurontin and Trazodone.  (*Id.*)

On November 3, 2014, Mendolera saw Dr. Ruch complaining of neck pain.  (*Id.* at 442.)  Mendolera
described the pain as constant, throbbing, achy, burning, and occasionally sharp, and it radiated into both
shoulders.  (*Id.*)  He also complained of occasional numbness and tingling in his hands and feet.  (*Id.*)  Dr.
Ruch noted that Mendolera was scheduled for an anterior cervical discectomy at C3 and a partial corpectomy
on November 12, 2014.  (*Id.*)  Dr. Ruch diagnosed Mendolera with cervical spondylosis[5] with myelopathy.

---

[5] Spondylosis is defined as "1. Ankylosis of a vertebral joint. 2. Degenerative spinal changes due to
osteoarthritis."  *Id.* at 1743.

(*Id.*)  Dr. Ruch's examination revealed Mendolera could move all extremities, he had a normal gait, and he had 5/5 grip strength bilaterally.  (*Id.* at 444.)

On November 12, 2014, Mendolera underwent a C3-C4 partial corpectomy, PEEK cage placement and Atlantis plating from C4 through C6, including a partial corpectomy at these vertebral junctions, and the placement of a PEEK cage and Atlantis plate spanning C3 and C6.  (*Id.* at 445-46.)  Dr. Ruch, who performed the procedure, noted Mendolera "was found to have a 3,4 disk osteophyte complex compressing the spinal cord and myelomalacia at C5-6, which was extensive and [sic] pressure on the spinal cord."  (*Id.* at 445.)

On December 30, 2014, Mendolera attended a post-surgery follow up appointment and he was doing well.  (*Id.* at 457.)  He no longer had arm pain but was still experiencing tingling in his hands and feet.  (*Id.*)  He also complained of itching and posterior neck pain, as well as difficulty with his range of motion in his neck.  (*Id.*)  On examination, Mendolera exhibited 5/5 motor strength in his upper and lower extremities, intact sensation to light touch, and some swelling between the incision and drain site.  (*Id.*)  Jill Sciko, PA-C, prescribed physical therapy for range of motion and strengthening, as well as refills for Percocet, Gabapentin, and Trazodone.  (*Id.* at 457-58.)

On January 14, 2015, Mendolera attended an initial evaluation for physical therapy with DPT Keselman.  (*Id.* at 506.)  Mendolera complained of intermittent pain that he rated at 7/10, controlled with Oxycodone, as well as bilateral paresthesia[6] and itching in his hands.  (*Id.*)  On examination, Keselman found Mendolera's cervical range of motion limited at 25% in all directions except for extension, which was limited at 10% of normal.  (*Id.*)  Keselman noted Mendolera was "apprehensive" of cervical range of motion, and her examination findings were "consistent with expected limited cervical ROM, poor posture,

---

[6] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus."  *Id.* at 1371.

decreased postural awareness and decreased strength." (*Id.*)  Mendolera was to follow up with Keselman one to two times a week for six to eight weeks.  (*Id.*)

On June 30, 2015, Mendolera reported he was doing better but was experiencing muscle spasms in his neck, arms, and legs.  (*Id.* at 464.)  A physical examination revealed full strength in Mendolera's upper and lower extremities.  (*Id.*)  Treatment providers prescribed Baclofen for Mendolera to try.  (*Id.*)

On August 18, 2015, Mendolera called his doctor's office complaining of muscle spasms and asking whether that was normal since he had surgery in November of last year.  (*Id.* at 552.)  Mendolera reported twitching and spasms in his entire body.  (*Id.* at 553.)  It was recommended Mendolera see a neurologist. (*Id.*)

On September 1, 2015, Mendolera again called his doctor's office complaining of spasms "that could be anywhere," including his legs, biceps, chest, or arms.  (*Id.* at 552.)  John Sternen, PA-C, noted Mendolera had seen Dr. Dashefsky the week before.  (*Id.*)  Dr. Dashefsky prescribed Baclofen, starting at 20 mg in an increasing scale.  (*Id.*)  PA-C Sternen told Mendolera that, from their perspective, Baclofen was the only drug available to treat such tremors, and that Mendolera should follow up with neurology for further treatmnet.  (*Id.*)  PA-C Sternen also informed Mendolera that the spasms could be the result of the damage to his spinal cord, the damage could take months to heal, and some symptoms could be permanent.  (*Id.*)

On September 9, 2015, Mendolera once again saw DPT Keselman for an initial evaluation for physical therapy.  (*Id.* at 500.)  Mendolera complained of persistent spasm and twitching that started shortly after his cervical fusion in January 2015.  (*Id.*)  Keselman noted Mendolera "[f]ailed to follow instructions for Baclofen dose gradation.  Had increased dosage from 10 mg/day to 60 mg/day on day 3 of prescription. States Baclofen has been ineffective." (*Id.*)  Mendolera told Keselman he had no pain at that time except for occasional pain following an intense twitch in his neck, and that he felt the constant need to move as his spasms and twitches occurred more in static positions.  (*Id.*)  On examination, Keselman found Mendolera's

cervical range of motion slightly limited in all directions.  (*Id.*)  She noted he had discontinued his previous physical therapy program because he said he had felt better exercising.  (*Id.*)  She recommended Mendolera undergo physical therapy twice a week for four to six weeks.  (*Id.*)

On September 25, 2015, Mendolera called his doctor's office complaining of chronic spasms and that Baclofen was not helping.  (*Id.* at 545.)  Megan Gritsik, PA-C, recommended Mendolera follow up with Dr. Dashefsky to see if there was anything else he could recommend.  (*Id.* at 546.)

On October 2, 2015, Mendolera called to ask his primary care provider, Vincent Dalessasndro, D.O., for a referral to a psychiatrist.  (*Id.* at 545.)  In November 2015, Mendolera saw Omar Elhaj, M.D., for an initial assessment.  (*Id.* at 565.)  Dr. Elhaj diagnosed Mendolera with generalized anxiety disorder, major depressive disorder (single episode, moderate), and alcohol abuse.  (*Id.*)  Mendolera complained of a depressed mood, low motivation, low self-esteem, difficulty with concentration, anxiety, excessive worrying, expecting worst-case scenarios, restlessness, and racing thoughts.  (*Id.*)  At that time, Mendolera rated his anxiety at 7/10 and his depression at 5/10.  (*Id.*)  Mendolera told Dr. Elhaj he had a decreased appetite and low energy.  (*Id.*)  He slept 3-4 hours a night, but his sleep was fine.  (*Id.*)  Mendolera also told Dr. Elhaj he was looking for employment opportunities.  (*Id.* at 566.)

During this examination, Dr. Elhaj noted that Mendolera exhibited intermittent generalized dystonia,[7] a cooperative attitude, restless behavior, and an anxious and depressed mood.  (*Id.* at 567.)  Dr. Elhaj assessed Mendolera as worsening and prescribed Mirtazapine to address Mendolera's insomnia, depression, and anxiety.  (*Id.*)  Dr. Elhaj also instructed Mendolera to abstain from alcohol for two weeks. (*Id.*)

On October 27, 2015, Mendolera saw neurologist David Riley, M.D., for a consultation.  (*Id.* at 583.) Mendolera told Dr. Riley that while he still had pain, it had improved and was now "way less;" he was not

---

[7] Dystonia is defined as "dyskinetic movements due to disordered tonicity of muscle."  *Id.* at 579.

taking pain medications. (*Id.*) His neck only hurt when he got a spasm and his neck twitched. (*Id.*) The spasms began in early 2015 after he stopped taking narcotics. (*Id.*) When a spasm occurs, his legs squeeze together, his chest tightens, and his neck twitches. (*Id.*) Sometimes the spasms occurred in one area in isolation, but often they occurred in all three areas at once. (*Id.* at 584.) He started taking Keppra a month ago for his spasms; it helped somewhat but did not stop the spasms. (*Id.*) He would take a Keppra pill when he "started twitching real bad." (*Id.*) Dr. Riley noted that shortly after Mendolera came into the exam room and sat down, he had to stand up and spent most of the time pacing the room, during which he had no spasms. (*Id.*) Mendolera told Dr. Riley he felt better if he was moving. (*Id.*)

On examination, Dr. Riley noted intermittent myoclonic spasms while Mendolera was sitting or lying on his back. (*Id.*) The spasms were "often generalized with adduction of legs and arms, and simultaneous head jerk," as well as "occas[ional] single shoulder shrug; sometimes a shuddering shake of an arm." (*Id.*) The spasms occurred approximately once per minute during the exam, but not while Mendolera was performing tasks. (*Id.*) When Mendolera was laying down, Dr. Riley noted "myoclonic spasms of synchronous adduction and internal rotation of both legs." (*Id.*) Dr. Riley also found "[h]igh-frequency, low-amplitude postural and kinetic tremor of both upper limbs," "[s]light rapid head tremor when examining eyes, but not when writing," "[a]bsent ankle jerks," a normal gait, mild tremor in his left hand but no tremor on the right, and no myoclonic spasms at all while writing and drawing. (*Id.* at 585.)

Dr. Riley suspected Mendolera had a "functional/psychogenic movement disorder, on the basis of incongruity of his movement disorder with any known 'organic' disorder, and inconsistencies." (*Id.*) Dr. Riley noted, "The good news is that there is no detectable permanent damage to the nervous system, so a complete recovery is possible." (*Id.*) But Dr. Riley described the long-term prognosis as guarded, as the "longer these disorders persist, the more they seem to become entrenched." (*Id.*) Dr. Riley recommended Mendolera take Keppra in larger doses prophylactically, instead of in response to the spasms. (*Id.* at 586.)

He also suggested Mendolera focus on finding a job within his limitations, or improving his situation so he could get a job, but Mendolera's attitude at that time was that there was no point in trying and he would just get fired.  (*Id.*)

On November 23, 2015, Mendolera saw Jason Wolf, M.D., for an evaluation of his elevated liver function tests.  (*Id.* at 665-66.)  Dr. Wolf noted Keppra had helped Mendolera's tremors "significantly." (*Id.* at 666.)

On November 30, 2015, Mendolera again saw Dr. Elhaj and told him he was ready to look for a job. (*Id.* at 574.)  Dr. Elhaj noted Mendolera had no dystonia at all that day.  (*Id.*)  Mendolera exhibited a cooperative attitude, anxious mood, fair insight, fair judgment, and normal thought process.  (*Id.*)  Dr. Elhaj found Mendolera was improving but increased the dosage of Mirtazapine to address Mendolera's "residual" symptoms.  (*Id.*)  Dr. Elhaj determined that Mendolera's "alcohol use, albeit less than before, continues to affect his [symptoms] and response to rx.  Therapy focused on managing expectations.  Fair response to therapeutic intervention."  (*Id.*)

On December 1, 2015, Mendolera saw Dr. Dalessandro for evaluation of his tremors and elevated liver tests.  (*Id.* at 589.)  Dr. Dalessandro noted that Mendolera reported tremors and focal weakness, but no dizziness, tingling, or sensory change.  (*Id.*)  Mendolera denied being depressed, having suicidal thoughts, memory loss, nervousness, anxiety, and insomnia.  (*Id.*)  On examination, Dr. Dalessandro found Mendolera had a normal range of motion, no edema or tenderness, normal strength, normal gait, and no Babinski's sign on the right or left.  (*Id.* at 591.)  Dr. Dalessandro recommended Mendolera continue with his current therapy but told him he could not lift any objects greater than five pounds given his history of spinal cord injury. (*Id.*)

In June 2016, Mendolera saw neurologist Dr. Joseph Rudolph for evaluation of his tremors.  (*Id.* at 636.)  Mendolera reported he had been experiencing tremors for about two years and began after his pain

medicine was discontinued.  (*Id.*)  Mendolera described muscle spasms, neck twitches, and tremorous shakes, with the neck twitch being more of a "violent jerk that triggers pain and throbbing for the rest of the day."  (*Id.*)  "Sometimes his body pulls everything to the middle – folding in half almost. At baseline, his hands and feet can have tingling, and sometimes there is stronger shooting pain in the neck and arms – bumping his head or overexertion exacerbates this."  (*Id.*)  Since being at rest makes the tremors worse, he gets up and paces.  (*Id.* at 637.)  Mendolera reported he has lost strength as most activities make his pain worse.  (*Id.*)  Mendolera told Dr. Rudolph that an increased dose of Keppra helped his tremors.  (*Id.*)  On examination, Dr. Rudolph found limited neck range of motion, normal motor bulk and strength, intact sensation to light touch, pin prick, and vibration, finger-to-nose-finger intact bilaterally with noticeable shakiness, and normal gait and posture.  (*Id.* at 638.)  Dr. Rudolph noted, with respect to Mendolera's reflexes, there was significant withdrawal and upgoing toes.  (*Id.*)  Dr. Rudolph prescribed clonazepam and Lyrica and continued Keppra.  (*Id.*)

On November 11, 2016, Mendolera saw Riad Laham, M.D., at the Cleveland Clinic Pain Management Department for a consultation.  (*Id.* at 679.)  Mendolera complained of chronic lower back, neck, bilateral upper arm, and lower right leg pain.  (*Id.*)  Mendolera told Dr. Laham he was unable to work because of his neck pain and twitching in addition to his back and right lower leg pain.  (*Id.*)  Mendolera rated his neck pain at 8/10.  (*Id.*)  He told Dr. Laham his neck spasms had not responded to Baclofen and was currently on Keppra "with little relief."  (*Id.*)  On examination, Dr. Laham found Mendolera had a good range of motion in his neck and back, no pain to palpation of the lumbar spine, negative straight leg raise test bilaterally, and 5/5 motor strength and tone throughout.  (*Id.* at 681-82.)  Dr. Laham diagnosed Mendolera as suffering from cervical post-laminectomy syndrome, radicular syndrome of the right lower extremity, cervicalgia, myoclonus[8] dystonia, and cervical radicular pain.  (*Id.* at 683.)  Dr. Laham prescribed

---

[8] Myoclonus is defined as "shocklike contractions of a portion of a muscle, an entire muscle, or a group of muscles, restricted to one area of the body or appearing synchronously or asynchronously in several areas.  It may be part of a

Zanaflex and Flexeril and told Mendolera to add over-the-counter non-steroidal anti-inflammatory drugs to his medication regimen.  (*Id.* at 684.)  As Mendolera could not afford physical therapy at that time, Dr. Laham recommended home exercise and swimming.  (*Id.*)  Mendolera could try epidural steroid injections if his symptoms did not improve.  (*Id.*)

On December 24, 2016, Mendolera saw Dr. Dashefsky for a neurological consultation regarding his abnormal eye movements.  (*Id.* at 1145.)  Mendolera complained of "jumpy vision" and "intermittent double vision" that began when he was watching TV on December 23, 2016.  (*Id.*)  Since then, he had been nauseous and having problems with his balance.  (*Id.*)  Dr. Dashefsky noted that Dr. Riley, "a movement disorder specialist," had diagnosed Mendolera with a functional movement disorder (per Mendolera) but Mendolera had more recently been treated by neurologist Dr. Rudolph, who diagnosed him with spinal myoclonus.  (*Id.* at 1145-46.)  On examination, Dr. Dashefsky noted no motor tremor or myoclonus, full strength, and poor hygiene.  (*Id.* at 1148.)  Dr. Dashefsky diagnosed opsoclonus[9] and myoclonus, etiology uncertain, and recommended an MRI/MRA of the brain and neck to rule out a structural lesion.  (*Id.* at 1145.)  Dr. Dashefsky reduced Mendolera's Keppra and Gabapentin doses and ordered thiamine and paraneoplastic antibodies.  (*Id.*)

On December 26, 2016, Mendolera was admitted to the hospital for dizziness, imbalance, and nausea.  (*Id.* at 691.)  Dr. Dashefsky noted abnormal eye movements, "imbalance slowly improving in association with thiamine, correction hyponatremia and reduction of Keppra and Gabapentin doses."  (*Id.* at 1154.)  He also found Mendolera's myoclonus and tremor "essentially resolved this admission."  (*Id.*)  Mendolera complained of difficulty seeing and being "off balance."  (*Id.*)  Dr. Dashefsky wrote:

> The patient admits to eating poorly the few weeks prior to admission as "I had no appetite".  [sic]  He admits to drinking between one and two case [sic] of beer per

---

disease process (e.g., epileptic or post-anoxic myoclonus) or be a normal physiological response (e.g., nocturnal myoclonus)."  *Id.* at 1213.

[9] Opsoclonus is "a condition characterized by nonrhythmic horizontal and vertical oscillations of the eyes, observed in various disorders of the brain stem or cerebellum."  *Id.* at 1319.

> week.  His father states that he looked around his apartment and there is evidence
> that he is drinking heavily.  In addition, the father spoke to one of the patient's
> friends and he has been drinking three to four cases of beer per week.

(*Id.*)  On examination, Dr. Dashefsky found "[r]apid eye movements in all directions of gaze persist but continue to be less prominent. EOMS full without apparent limitation of lateral gaze . . . No tremor or involuntary movements noted."  (*Id.* at 1156.)

On December 27, 2016, Mendolera still had jumpy vision and imbalance, but had no headache, double vision, focal weakness, or sensory symptoms.  (*Id.* at 1158.)  His Keppra dose was low, and his thiamine and Gabapentin levels were "pending."  (*Id.*)  On examination, Dr. Dashefsky found Mendolera's nystagmus[10] unchanged and he had full strength.  (*Id.* at 1160.)

On December 30, 2016, Mendolera saw James Lane, M.D., for complaints of dizziness, decreased vision in both eyes, blurred vision, and photophobia.[11]  (*Id.* at 691.)  Mendolera reported feeling a little bit better but his vision was still very blurred.  (*Id.*)  Dr. Lane noted, "Since onset vertigo, patient has had vertical nystagmus."[12]  (*Id.*)  Mendolera reported being unable to look at objects "without feeling uneasy" and being very light sensitive.  (*Id.*)  Mendolera told Dr. Lane "no matter what he looks at (people or objects) are fluttering and moving up and down," he was unable "to function without getting dizzy," and while his diplopia[13] was better, he still could not accomplish his daily tasks without difficulty.  (*Id.*)  Dr. Lane diagnosed Mendolera with vertical nystagmus, nuclear sclerosis, disorder of refraction, and diabetes without diabetic neuropathy.  (*Id.* at 693-94.)  Dr. Lane noted Mendolera reported "his eye movements have

---

[10] Nystagmus is "an involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotary, or mixed, i.e., of two varieties."  *Id.* at 1296.
[11] "Abnormal visual intolerance of light."  *Id.* at 1431.
[12] Vertical nystagmus is "an up-and-down movement of the eyes."  *Id.* at 1296.
[13] Diplopia is "the perception of two images a single object; called also . . . *double vision . . . .*"  *Id.* at 525 (italics in original).

improved over the past week (during which he received Thiamine).  Motility disturbance and overall clinical picture consistent with diagnosis of Wernicke's."[14]  (*Id.*)

On January 4, 2017, Hillcrest Hospital transferred Mendolera to Brookdale Westlake skilled nursing facility.  (*Id.* at 695.)  On admission, Mendolera told his treatment providers that he was unable to read a menu or watch TV due to the disturbance in his vision.  (*Id.* at 856.)  On January 5, 2017, treatment providers at Brookdale Westlake listed Mendolera's primary diagnosis as "[s]uspected Wernicke ophthalmoplegia secondary to excessive alcohol intake," with secondary diagnoses of "diabetes mellitus, hypertension, anxiety depressive disorder, and history of alcohol abuse."  (*Id.* at 848.)  Mendolera told his providers that his vision was improving somewhat but he was still having difficulty with his balance.  (*Id.*)  On January 6, 2017, Mendolera reported "continuing visual disturbances of objects 'moving up and down'" but denied double vision.  (*Id.* at 861.)  He stated his vision was improving but he still could not read.  (*Id.*)  Providers assessed Mendolera as having benign prostatic hypertrophy, dizziness, diplopia, diabetes, alcohol abuse, and gait instability.  (*Id.*)  On January 7, 2017, treatment providers noted Mendolera was "currently having vision problems and [could] not focus well," but he "like[d] to use the iPads, visit family, listen to music, and play cards."  (*Id.* at 858.)  On January 9, 2017, Mendolera again reported that he continued to have "visual disturbance described as things jumping up and down" but again denied double vision.  (*Id.* at 862.)  Mendolera told his treatment providers his vision had improved since his hospitalization, but he was still unable to read.  (*Id.*)  His dizziness had decreased, he was more stable on his feet, and he was walking independently without falls, but his visual disturbance affected his equilibrium "a little bit."  (*Id.*)  Mendolera

---

[14] Wernicke's encephalopathy is "a neurological disorder characterized by confusion, apathy, drowsiness, ataxia of gait, nystagmus, and ophthalmoplegia. It was first described by Wernicke in 1881 and is now known to be due to thiamine deficiency, usually from chronic alcohol abuse . . .  Called also *Wernicke's disease* or *syndrome*. . . . Id.* at 611 (italics in original).

could not see the numbers on his cell phone to place a call, read the screen on his Accucheck machine, or

see the markings on an insulin pen.  (*Id.* at 859.)  No "s/s alcohol withdrawal noted."  (*Id.*)

On January 11, 2017, Mendolera saw Joseph Rudolph, M.D.  (*Id.* at 990.)  At this visit, Mendolera

reported the following:

> 1) The jerkiness and the pain have slowed down. Both are still present, but the movements are mostly subsided. This (reduction in the movement frequency) helps with the pain; overall, the pain can still be severe. The pain is present in the neck, hands, feet, and shoulders. The pain is different all over. In the limbs he has tingling, the neck and shoulders have variable pains, aching and others. The sciatic area hurts severely on the R side.
>
> 2) Two weeks ago (Dec 24), while he was watching television, the vision began to jerk and bounce vertically - this actually began with double vision. This was accompanied with nausea and dizziness. By "dizzy" he means the unsettling feeling he felt at looking at moving objects. He was confused a little at the time, saying things he did not recall, or remembering incorrectly what he HAD said. He was also disoriented. This has progressively gotten better.  Perhaps his twitching and pain actually improved in the hospital! He also enjoyed the physical therapy.

(*Id.* at 990-91.)

Dr. Rudolph reiterated that Mendolera's twitching appeared to have improved somewhat while he

was in the hospital for vertigo and noted that Keppra, which he takes for the spasms, has a small percentage

(3-5%) of causing vertigo.  (*Id.* at 991.)  Alternatively, he may have had a viral infection with labyrinthitis.[15]

(*Id.*)  Dr. Rudolph noted Cymbalta was added to Mendolera's medication regimen in the hospital and may

have contributed to the improvement in his twitching and pain.  (*Id.*)  Mendolera could continue the

Cymbalta and may benefit from a higher dose.  (*Id.*)  Dr. Rudolph recommended an MRI of Mendolera's

"L-spine," continued hydration, a temporary high dose of ibuprofen along with omeprazole and meclizine,

continued exercise, continued thiamine, and a lower dose of Keppra.  (*Id.* at 992.)

---

[15] "[I]nflammation of the labyrinth; it may be accompanied by hearing loss or vertigo."  *Id.* at 988.

15

On January 18, 2017, Mendolera saw Dr. Dalessandro for a follow up visit.  (*Id.* at 943.)  Dr. Dalessandro noted Mendolera was "unable to see because of nystagmus."  (*Id.*)  Mendolera reported he had been unable "to take care of himself because of this recent change in vision."  (*Id.*)  Mendolera also complained of blurred vision, double vision, depression, nervousness, and anxiety.  (*Id.*)  On examination, Dr. Dalessandro found Mendolera to be in no distress with a normal range of motion and gait.  (*Id.* at 946.)  Positive examination findings included weakness and abnormal muscle tone.  (*Id.*)  No Babinski's sign was present on the right or left sides.  (*Id.*)  Dr. Dalessandro diagnosed Mendolera with myoclonus dystonia, uncontrolled Type Two diabetes, benign hypertension, diplopia, vision changes, and nystagmus.  (*Id.* at 946-47.)

On January 25, 2017, Mendolera saw Dr. Vivian Ebert for complaints of right-sided sciatic pain and bilateral lower back pain.  (*Id.* at 1009.)  Mendolera rated his pain at a 9/10.  (*Id.*)  On examination, Dr. Ebert noted inflammation of the para-spinal tissues, decreased range of motion, and positive straight leg raise test.  (*Id.*)  An MRI of Mendolera's lumbar spine, done the same day, revealed degenerative lumbar spondylosis, present most significantly at L5-S1 where posterior disc herniation contacts the right S1 nerve root.  (*Id.* at 987.)  X-rays of the lumbar spine, also done the same day, showed advanced degenerative change at L5-S1 and mild to moderate left and mild right hip osteoarthritis.  (*Id.* at 988.)

On January 27, 2017, Mendolera saw Dr. Ebert for a follow up visit.  (*Id.* at 1014.)  Mendolera reported he was having problems with nystagmus and vision and flew to Florida because he was unable to drive or read.  (*Id.*)  Mendolera rated his back pain at 9/10, and the pain was made worse by sitting, standing, walking, bending, and lying down.  (*Id.*)  On examination, Dr. Ebert found decreased range of motion and a positive straight leg raise test.  (*Id.*)

On February 27, 2017, Mendolera completed a back questionnaire and reported that his pain came and went and was very severe.  (*Id.* at 1004.)  Mendolera also reported that his pain interfered with his

16

personal care, sleep, sitting, standing, walking, travelling, and social life. (*Id.*) However, Mendolera stated his pain seemed to be getting better, although improvement was slow. (*Id.*)

On March 24, 2017, Mendolera saw Joshua Pasol, M.D., at the Bascom Palmer Eye Institute in Naples, Florida, for a second opinion regarding his "fluttering eye movements." (*Id.* at 1082-83.) Mendolera's eyes were fluttering less, but he still had difficulty focusing on reading material. (*Id.* at 1082.) Mendolera denied double vision at this time. (*Id.*) Dr. Pasol noted Mendolera had not consumed any alcohol since December 23, 2016. (*Id.*) On examination, Dr. Pasol found upbeat "[n]ystagmus like" movements. (*Id.* at 1083.) Dr. Pasol noted thiamine and an increased dose of gabapentin improved Mendolera's symptoms but they remained unresolved. (*Id.*) Dr. Pasol thought continued neurological evaluation should occur and suggested trying a "small prism for lht." (*Id.*)

On April 6, 2017, Mendolera underwent a lumbar disc excision to address his herniated disc at L5-S1 on the right. (*Id.* at 1037.)

On April 20, 2017, Mendolera saw Patrick O'Connor, M.D., for follow up regarding his fluttering eye movements. (*Id.* at 1134.) Dr. O'Connor noted Mendolera had been diagnosed with Wernicke's syndrome in the past. (*Id.*) Mendolera's "present history of acute onset nystagmus and vertigo was evaluated in Cleveland and by hx he is doing much better although prism trial not helpful. On exam today he has no phorias or tropias but does have a variable up beating nystagmus worse with one eye covered. This is present in al[l] directions of gaze and not consistently worse in one field of gaze." (*Id.*) Dr. O'Connor's impression was that the acute onset nystagmus was possibly ischemic in nature and was improving. (*Id.* at 1135.) He ordered blood work and recommended Mendolera see a neurologist for further work up of his myoclonus. (*Id.*)

On May 4, 2017, Mendolera saw Dr. Dalessandro for evaluation of his diabetes, myoclonus dystonia, and lipidemia. (*Id.* at 1046.) Mendolera complained of back, joint, and neck pain, but denied depression,

memory loss, suicidal ideas, nervousness, anxiety, and insomnia.  (*Id.*)  On examination, Dr. Dalessandro found Mendolera in no distress, had a normal range of motion, no tenderness or edema, normal strength and gait, and no Babinski's sign on the right or left.  (*Id.* at 1048.)  Dr. Dalessandro noted Mednolera's mood, memory, affect, and judgment were normal.  (*Id.* at 1049.)

On June 23, 2017, Mendolera saw Dr. O'Connor for a follow up examination.  (*Id.* at 1137.) Mendolera reported some improvement in oscillopsia[16] but was still having trouble with reading and focusing.  (*Id.* at 1138.)  On examination, Dr. O'Connor found Mendolera's nystagmus unchanged.  (*Id.*) The blood work Dr. Pasol ordered was negative.  (*Id.*)  As Mendolera was returning to Cleveland, Dr. O'Connor recommended going to the Cleveland Clinic for follow up.  (*Id.*)

In July 2017, Kerri Rautenkranz, PT, noted Mendolera had met his goal of being able to put on shoes and socks without difficulty.  (*Id.* at 1121.)

On October 10, 2017, Mendolera saw rheumatologist David Mandel, M.D., for spinal arthritis, status post spinal laminectomy, diabetes, hypertension, polyarthritis, arthralgias, and hypovitaminosis D.  (*Id.* at 1184.)  On examination, Dr. Mandel found slight tenderness over the left sacroiliac joint, "fairly good" forward bending of the spine, some tenderness over the lateral epicondyles, and intact sensation in the hands. (*Id.*)  Dr. Mandel noted Mendolera was "actively involved in a new career, possibly in health care."  (*Id.*) Dr. Mandel recommended Mendolera continue with his range of motion exercise.  (*Id.*)

On December 22, 2017, Mendolera saw Dr. Dalessandro for an annual physical examination.  (*Id.* at 1177.)  Mendolera reported double vision but denied blurred vision and discharge.  (*Id.*)  Mendolera also complained of back pain, neck pain, dizziness, tingling, tremors, sensory change, and focal weakness.  (*Id.*) Mendolera denied depression, memory loss, suicidal ideas, nervousness, anxiety, and insomnia.  (*Id.*)  On

---

[16] "[O]scillating vision, a condition in which objects seem to move back and forth, to jerk, or to wiggle; it sometimes accompanies downbeat nystagmus."  *Id.* at 1330.

examination, Dr. Dalessandro found Mendolera had "abnormal dilated pupils" and both eyes exhibited "abnormal extraocular motion and nystagmus." (*Id.* at 1177, 1180.)  Other positive examination findings included musculoskeletal deformity, weakness, atrophy, abnormal muscle tone, abnormal cerebellar exam, and abnormal gait.  (*Id.* at 1180.)  Mendolera had a normal range of motion in his neck.  (*Id.*)  Dr. Dalessandro diagnosed Mendolera with Type Two diabetes mellitus with retinopathy of left eye and macular edema and a history of spinal cord injury.  (*Id.* at 1181.)

## C.     State Agency Reports

### 1.     Mental Impairments

On December 2, 2015, on initial review, Connie Jenkins, M.D., determined Mendolera had medically determinable mental impairments that did not precisely satisfy the "A" criteria of the listings.  (*Id.* at 116-17, 130.)  Regarding the "B" criteria, she found Mendolera had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  (*Id.* at 117, 130.)  The record evidence failed to establish the presence of "C" criteria.  (*Id.*)  Dr. Jenkins concluded the evidence suggested Mendolera did not have a severe mental health impairment.  (*Id.*)

On April 15, 2016, Mary K. Hill, Ph.D., affirmed Dr. Jenkins's conclusions on reconsideration.  (*Id.* at 147, 163-64.)  She agreed Mendolera's limitations from his psychiatric symptoms were not severe.  (*Id.* at 147, 163.)

### 2.     Physical Impairments

On December 1, 2015, on initial review, Stephen Sunderland, M.D., opined Mendolera could perform light work, with additional limitations.  (*Id.* at 118-21, 132-34.)  He could occasionally crawl.  (*Id.* at 119, 132.)  He could never climb ladders, ropes, or scaffolds.  (*Id.*)  His ability to push and pull was unlimited, other than shown, for lift and/or carry.  (*Id.*)  He must be allowed the opportunity to change

position every 30 minutes for up to three minutes as needed for comfort, to include breaks and meals.  (*Id.*) Mendolera's ability to reach overhead bilaterally was limited, but his ability to handle, finger, and feel was unlimited.  (*Id.* at 119-20, 132-33.)  Mendolera must avoid concentrated exposure to extreme cold, vibrations, and hazards (machinery, height, etc.).  (*Id.* at 120, 133.)  Dr. Sunderland opined that Mendolera must avoid ladders, ropes, scaffolds, and the three environmental categories because of his pain and spasms. (*Id.* at 119-20, 132-33.)

On April 18, 2016, on reconsideration, Indira Jasti, M.D., affirmed Dr. Sunderland's findings except she opined that Mendolera's ability to be exposed to extreme cold was unlimited and he must avoid all exposure to hazards (machinery, heights, etc.).  (*Id.* at 149-53, 165-68.)  She found Mendolera was precluded from ladders, ropes, scaffolds, and hazards because of his recurrent muscle spasms.  (*Id.* at 150-51, 166-67.)

**D.    Hearing Testimony**

During the October 3, 2017 hearing, Mendolera testified to the following:

- He lives with his father in Estero, Florida.  (*Id.* at 81.)  He had lived there for approximately eight months.  (*Id.*)  Before that he was living on his own in his mother's house in Chesterland, Ohio, where he had lived for approximately 14 years.  (*Id.* at 81-82.)  He moved because he was recovering from neck surgery and was unable to work and live on his own.  (*Id.* at 81.) After surgery, he could no longer feed himself and have a home, pay bills, or do any kind of work.  (*Id.* at 82.)  Before his surgery, he performed all the household maintenance and yard work, and believed he had managed "very well."  (*Id.*)  He does not do any chores at his father's house, because his father did not want him to and because he has difficulty doing so.  (*Id.* at 82-83.)

- He can bathe and dress himself.  (*Id.* at 83.)  He spends his days riding along with his father, who works part time watching people's vacation homes and as the city fire commissioner.  (*Id.* at 83-84.)  Mendolera also helps prepare things, get ready for dinner, and clean a dish.  (*Id.* at 83.)  He also watches television and reads a little bit.  (*Id.*)

- He drives, although he uses his judgment and does not drive on days when he believes it is not a good idea.  (*Id.* at 84, 99.)  He usually does not have a problem driving for short periods of time.  (*Id.* at 99.)  There is maybe one day a week where he feels he should not drive. (*Id.* at 99-100.)

- He grocery shops with his father.  (*Id.* at 93.)  The heaviest item he lifts when he goes grocery shopping is probably 10 pounds.  (*Id.*)  He is unable to do yard work, carry a vacuum up and

down steps, move things, or do any work that requires a ladder. (*Id.* at 100-01.) Sometimes he has a hard time leaving the house. (*Id.* at 100-01.)

- The biggest medical issue preventing him from working is his spine. (*Id.* at 92.) He has limited movement, limited ability to lift, stretch, pick things up, and/or move things, and limited ability to turn his head side to side and up and down. (*Id.* at 93.) He could not jump or run. (*Id.*) He lifts as little as possible, just clothes or a piece of paper off the floor. (*Id.*) He is not taking any medication for his back other than ibuprofen occasionally. (*Id.* at 96.)

- He has problems focusing his vision for reading, distance, and looking at something for a period of time. (*Id.* at 96-97.) He needs to look away after 30 seconds and refocus because it gets blurry. (*Id.* at 97.) This happens multiple times per day and lasts for a matter of seconds. (*Id.* at 104.) When reading, he can read a sentence or two then must look away, refocus, and then read a little more. (*Id.* at 97.) He has to stop and start "quite a bit" when reading. (*Id.*) These vision problems affect his driving and writing. (*Id.* at 105.) There are no specific therapies to address his condition. (*Id.* at 98.) He is to maintain a healthy lifestyle, eat right, take his medications, and learn to live with his condition. (*Id.* at 97.) He has noted improvement in his eyes over the past year or so. (*Id.* at 106.)

- He experiences tingling sensations in his arms and legs. (*Id.* at 108.)

During the March 6, 2018 supplemental hearing, Mendolera testified to the following:

- He is living alone in an apartment in Mayfield Heights, Ohio. (*Id.* at 42.)

- He is managing chores at his apartment "very well." (*Id.*) He is still driving. (*Id.*) If he feels woozy or is not seeing right or dizzy, he will not drive, but that does not happen very often. (*Id.* at 49-50.)

- He still struggles with depression, but mostly he struggles with his anxiety. (*Id.* at 43.) He experiences anxiety daily. (*Id.* at 43-44.) But his anxiety has improved as his health has improved and as he moves towards having "stable employment." (*Id.* at 44.)

- He recently received property, casualty, life, and health insurance licenses. (*Id.*) He is working with Farmers Insurance by going through their education program. (*Id.*) The licensing portion was the hardest part. (*Id.* at 55-56.) Once he finishes, he will be able to sell insurance for them. (*Id.* at 44.) His work would be a combination of working in the office, going to people's homes, and going to events. (*Id.* at 53.) Ideally, he would do as much work from the office as possible. (*Id.* at 54.) He hopes to open his own agency eventually. (*Id.* at 53.)

- He still experiences vision problems, which makes it more difficult for him to go through the insurance education because reading is hard, and it takes him longer to get through things. (*Id.* at 45.) One of his eye doctors suggested he use a piece of paper to keep his place, and that made it a lot better for him. (*Id.*) He is learning to live with his "disabilities." (*Id.* at 46.)

- He still experiences issues with his balance and coordination, but they are "way, way, way better now than [they] used to be." (*Id.*) He also still experiences tingling or a "pins and needles" feeling in his hands and feet, but it has "progressively gotten better" and he thought

the medication helped.  (*Id.* at 46-47.)  He tries to stay active, take his medication, and change positions a lot.  (*Id.* at 47.)

- He does not get good sleep and he does not sleep through the night, but he does not nap during the day.  (*Id.*)  He used to sleep during the day when his doctors were adjusting his medications; sometimes the doses were too high and made him tired, sometimes he would be so tired because he did not get any sleep.  (*Id.* at 47-48.)  But now his medications are right, he is eating right, and he exercises, so he feels good during the day and then is tired at the end of the day.  (*Id.* at 48.)

- He realized things had gotten better and he was able to do things again when he was living in Florida after "extensive rehab" and could drive again.  (*Id.* at 48-49.)

- He can reach for something above shoulder level if it is very light, although he is not supposed to.  (*Id.* at 50.)  He usually just reaches for plates in the cabinet.  (*Id.*)  He does not lift anything heavy or lift anything over his head.  (*Id.*)  He cannot put on socks and shoes while standing, but he can when he is sitting.  (*Id.*)  His doctors told him not to lift more than 20 pounds.  (*Id.* at 51.)

- He always feels discomfort, but he is learning to live with it.  (*Id.*)  He could walk a couple of miles before he would have to stop because of the pain.  (*Id.* at 52.)  He constantly alternates positions when he is sitting, and alternates between sitting and standing.  (*Id.*)  He does not need to elevate his legs when he is sitting in a chair.  (*Id.* at 53.)

The VE testified Mendolera had past work as a physical inventory clerk, general hardware sales person, mortgage loan originator, and a combination job of telephone sales representative and advertising sales representative.  (*Id.* at 62.)  The ALJ then posed the following hypothetical question:

> First off, I would like you to consider a person with the same age, education, and past work as the claimant. He is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He is able to stand and walk six hours of an eight-hour work day. He is able to sit for six hours of an eight-hour work day. This individual would have unlimited push and pull other than shown for lift and/or carry. They could never climb ladders, ropes, or scaffolds, and could occasionally crawl, and would have occasional overhead reaching bilaterally. This individual must avoid concentrated exposure to extreme cold and vibration, and avoid concentrated exposure to hazards, and by that I mean unprotected heights and operating heavy moving machinery. First off, given such a hypothetical individual, would this hypothetical individual be able to perform the claimant's past work as those occupations are either generally and/or actually performed?

(*Id.* at 63-64.)

The VE testified the hypothetical individual would be able to perform Mendolera's past work as a general hardware sales person, mortgage loan originator, telephone sales representative, and advertising sales representative, as generally performed.  (*Id.* at 64.)

The ALJ changed the first hypothetical to reflect the "hypothetical individual can occasionally lift and carry 10 pounds and frequently lift and carry five pounds, and can stand and walk two hours of an eight-hour work day.  The remainder of that hypothetical would be the same."  (*Id.* at 65.)  The ALJ asked the VE whether the hypothetical individual could perform Mendolera's past work.  (*Id.*)  The VE testified the individual would be able to perform Mendolera's past work as a mortgage loan originator and telephone sales representative, as generally performed.  (*Id.*)

The ALJ asked the VE whether there would be any jobs for an individual off task approximately 25% of the time because of chronic pain.  (*Id.* at 64-66.)  The VE testified there would be no jobs.  (*Id.*)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b)*,* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Mendolera was insured on his alleged disability onset date, August 28, 2015, and remained insured through September 30, 2016, his date last insured ("DLI").  (Tr. 10.)  Therefore, in order to be entitled to POD and DIB, Mendolera must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2016.

2.    The claimant has not engaged in substantial gainful activity since August 28, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease (lumbar and cervical), cervical post-laminectomy syndrome, diabetes, neuropathy, arthritis, and myoclonus dystonia (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can never climb ladders, ropes, and scaffolds.  He can occasionally crawl and reach overhead bilaterally.  He needs to avoid concentrated exposure to extreme cold, vibration; and avoid concentrated exposure to hazards meaning unprotected heights, and operating heavy/moving machinery.

6.    The claimant is capable of performing past relevant work as a Mortgage Loan Originator.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2015, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 12-21.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White*

25

*v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    First Assignment of Error: Step Two Challenge

Mendolera argues the ALJ's failure to find his depression and anxiety severe impairments at Step Two was error "and provides grounds for reversal or remand."  (Doc. No. 13 at 16.)  According to Mendolera, the ALJ determined Mendolera's affective disorder and anxiety disorder were non-severe impairments "due to a lack of ongoing mental health treatment."  (*Id.*)  Mendolera asserts this determination was improper and mischaracterized his conditions and symptoms, as well as the record.  (*Id.* at 16-17.)

The Commissioner argues substantial evidence supports the ALJ's Step Two determination.  (Doc. No. 16 at 5-7.)  According to the Commissioner, "The ALJ followed the appropriate regulations and utilized logical reasons grounded in the record to determine Plaintiff had no more than mild limitations in the relevant domains."  (*Id.* at 6.)  The Commissioner disputes Mendolera's assertion that his lack of ongoing mental health treatment was the reason for the ALJ's finding his mental impairments non-severe.  (*Id.*)

At Step Two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (4)(ii), 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the

claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).[17]

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v.*

---

[17] Revised versions of these regulations took effect on March 27, 2017 and apply to disability applications filed on or after that date.  *See* 82 Fed. Reg. 5868 (January 18, 2017).

*Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and the claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant."  *Anthony*, 266 F. App'x at 457.

The ALJ's Step Two analysis regarding Mendolera's mental impairments follows:

> The claimant has nonsevere impairments of affective disorder, anxiety disorder, and substance addiction disorder. The claimant does not receive ongoing mental health treatment, but he is prescribed Remeron for sleeping and anxiety (Ex. 12E). Recent medical evidence shows the claimant is involved in a new career (Ex. 40F). The claimant testified he is in the process of obtaining an insurance licensure.

> The claimant's medically determinable mental impairments of affective and anxiety disorders and substance addiction disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

> In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four areas of mental functioning are known as the "paragraph B" criteria.

> The first functional area is understanding, remembering, or applying information. In this area, the claimant has a mild limitation.  On January 26, 2017, the claimant reported he used an Ipad. He could play cards (Ex. 19F, p. 19). An examination on May 4, 2017 noted the claimant did not report memory loss. He was oriented in all spheres. Judgment was normal (Ex. 29F, p. 4). The claimant testified he is in training for a licensure for insurance sales.

> The next functional area is interacting with others. In this area, the claimant has a mild limitation. On January 26, 2017, the claimant reported he visited family and played cards (Ex. 17). An examination on May 4, 2017 noted the claimant was not nervous or anxious. His affect was normal (Ex. 29F, p. 4).

> The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. An examination on May 4, 2017 noted the claimant's memory was good (Ex. 29F, p. 4).

The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation. An examination on May 2, 2017 noted the claimant the claimant [sic] returned briefly to Cleveland, Ohio to care for his mother and sister after they had surgery (Ex. 34F, p. 5). He could perform some household chores, personal care, and lawn care.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 404.1520a(d)(l) and 416.920a(d)(l)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 13-14.)

Contrary to Mendolera's argument, the ALJ did not find his mental impairments non-severe because of his lack of ongoing mental health treatment.  The ALJ considered the four functional areas, found Mendolera had only mild limitations in each (with citations to the record in support), and concluded his mental impairments were non-severe.  (*Id.*)  Mendolera fails to identify any contrary lines of evidence the ALJ ignored or overlooked.[18]  (*See* Doc. No. 13 at 16-18.)  Nor does Mendolera argue that the ALJ failed to consider his non-severe mental impairments in determining his RFC.  (*Id.*)  The Court's review of the ALJ's decision reveals that the ALJ considered Mendolera's severe and non-severe impairments in her RFC

---

[18] While Mendolera argued the ALJ "omit[ted] reference" to his moving to Florida "due to worsening of his overall health" (Doc. No. 13 at 18), he does not assert that his moving to Florida was tied to his mental health impairments.  (*See id.*)  In fact, he testified at the October 2017 hearing that the reason he moved to Florida was because he could not feed himself, take care of a house, pay bills, or do any kind of work after his neck surgery.  (Tr. 81-82.)  Moreover, the ALJ discussed evidence regarding his time in Florida in her RFC analysis.  (*Id.* at 20.)  Mendolera also asserts that the ALJ mischaracterized the record and drew negative inferences, but he fails to identify any specific mischaracterizations in his brief.  (*See* Doc. No. 13 at 16-18.)

analysis.  (Tr. 14-21.)  Therefore, even if the ALJ erred at Step Two, such error was harmless.  *Maziarz*, 837 F.2d at 244; *Nejat*, 359 F. App'x at 577; *Anthony*, 266 F. App'x at 457.

## B.    Second Assignment of Error: RFC Challenge

Mendolera argues, "The ALJ's RFC determination is contrary to the requirements of SSR 96-8p and is not supported by substantial evidence for its failure to account for the exertional limitations associated with [his] full-body tremors and spasms, visual limitations, limitations on [his] ability to finger and feel, and time spent off-task as a result of [his] various conditions and symptoms."  (Doc. No. 13 at 19.)

The Commissioner responds: (1) Mendolera's "[f]ull-body tremors and spasms were accounted for and thus the ALJ made no more than a harmless articulation error"; (2) "[s]ubstantial evidence supports the ALJ's analysis of [Mendolera's] vision"; and (3) "[t]he ALJ made no more than a harmless error in not providing finger-feel limitations."  (Doc. No. 16 at 7-10.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§§ 404.1527(d)(2), 416.927(d)(2).[19]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. §§ 404.1546(c), 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence,

---

[19]  This regulation has been superseded for claims filed on or after March 27, 2017.  As Mendolera's application was filed in September 2015, this Court applies the rules and regulations in effect at that time.

if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

The ALJ is obligated to consider the record as a whole.  *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir.1985). It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence.  *Morris v. Sec'y of H.H.S.*, No. 86–5875, 845 F.2d 326 (Table), 1988 WL 34109, at *2 (6th Cir. April 18, 1988).  Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id.* (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).  However, an ALJ is not required to provide detailed evaluation of every piece of evidence contained within the record. Rather, the ALJ is charged with providing *minimal* articulation of their assessment of the evidence. *See Morris,* 1988 WL 34109, at *2.

Moreover, an ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, No. 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014).  This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion.  *Snyder*, 2014 WL 6687227, at *10 (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

The Court finds the ALJ properly discussed the evidence and made a clear connection between the RFC and her discussion.  The ALJ's RFC analysis contains an exhaustive discussion of the record evidence. (Tr. 14-21.)  The ALJ acknowledged and weighed the treating source opinions and other medical opinions in the record.[20]  (*Id.* at 18-20.)  The ALJ considered Mendolera's hearing testimony, where he stated he could care for his personal needs, his balance had improved, and he was in training classes for insurance sales with Farmers Insurance.  (*Id.* at 20.)   Mendolera does not identify any contrary lines of evidence the ALJ ignored or overlooked, nor does he accuse the ALJ of cherry-picking the record.  (*See* Doc. No. 13 at 19-24.)  At bottom, Mendolera's RFC arguments are requests for the Court to reweigh the evidence, which it will not do.

The ALJ's analysis of the records are supported by substantial evidence.  First, the records show Mendolera's tremors improved with Keppra (*id.* at 630), and Mendolera did not mention his tremors at either hearing before the ALJ.  (*Id.* at 36-67, 69-110.)  Second, contrary to Mendolera's assertion, the RFC limitations that Mendolera could never climb ladders, ropes, or scaffolds and must avoid concentrated exposure to hazards such as unprotected heights and operating heavy machinery address concerns and limitations relating to Mendolera's tremors.  (*Id.* at 119-20, 132-33, 150-51, 166-67.)

Regarding his vision, Mendolera testified at his October 2017 hearing that his eye condition had improved in the past year or so.  (*Id.* at 106.)  He later testified at his March 2018 supplemental hearing that using a piece of paper to keep his place helped with his reading, that he had passed the tests for insurance licenses, and he was in training classes for insurance sales with Farmers Insurance.  (*Id.* at 20, 44-45, 55.)

With respect to the absence of finger-feel limitations, the record shows Mendolera could put on shoes and socks without difficulty, had intact sensation in his hands, and could care for his personal needs.

---

[20] Mendolera does not challenge the ALJ's findings regarding the treating source opinions and other medical opinions in the record or the weight assigned.  (Doc. No. 13 at 19-24.)

(*Id.* at 42, 50, 83, 1121, 1184.)  While Mendolera asserts the "Treating Source Statements submitted by [his] treatment providers further endorse the limitations to [his] gross and fine motor movements in his hands" (Doc. No. 13 at 23), the ALJ assigned limited weight to those opinions and Mendolera failed to challenge the weight assigned in his brief.

Furthermore, in early November 2015 (less than three months after the disability onset date), Mendolera reported he was looking for employment opportunities.  (Tr. at 566.)  Later that month, he told Dr. Elhaj he was ready to look for a job.  (*Id.* at 574.)  One week after his October 2017 hearing, Mendolera told Dr. Mandel he was "actively involved in a new career."  (*Id.* at 1184.)  At his March 2018 hearing, Mendolera testified that he planned to work for Farmers Insurance upon completion of his training classes and he hoped to open his own insurance agency one day.  (*Id.* at 44, 53.)

Mendolera's conditions fluctuated over the years, and the evidence in the record is mixed.  Although Mendolera cites evidence from the record he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  The ALJ clearly articulated her reasons for finding Mendolera capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

Date:  December 4, 2019

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**